U. S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

MAR 3 1 2009

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY
SHREVEPORT

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| EOG RESOURCES, INC. | CIVIL ACTION NO: 07-1246 |
| VERSUS | JUDGE DONALD E. WALTER |
| CHESAPEAKE LOUISIANA, ET AL. | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

Plaintiff, EOG Resources ("EOG"), filed suit on July 31, 2007, against Defendants, Chesapeake Energy Corp., Chesapeake Operating Inc., and Chesapeake Louisiana L.P., (collectively referred to as "Chesapeake"), for the recovery of damages and an accounting for EOG's share of production from three oil wells drilled by Defendants. *See* Doc. #1. Plaintiff and Defendants each filed motions for summary judgment. *See* Docs. # 27 and #33. The Court deferred ruling on the merits of these motions to trial. *See* Doc. #47. Bench trial was held on October 27, 2008. The Court heard all evidence and testimony presented by the Plaintiff. At the close of Plaintiff's case, Defendants made an oral motion for a Judgment on Partial Findings pursuant to Federal Rule of Civil Procedure 52(c). The Court granted Defendants' motion for the reasons set forth below.

## FINDINGS OF FACT[1]

EOG and Chesapeake are each owners of mineral leases of a certain township in south Bossier Parish, Louisiana, Section 18. EOG owns the 240 acre R.O. Roy mineral lease in Section 18. *See* Doc. #48, Stipulation of Fact No. 1; Plaintiff Ex. 2. Chesapeake owns the mineral leases

---

[1] The Court supplements the stipulated facts contained in the pretrial order [Doc. #48] with documentary evidence presented during the bench trial of the instant matter.

covering the remaining 400 acres of Section 18.[2] *See* Doc. #48, Stipulation of Fact No. 2; Plaintiff Ex. 2. EOG and Chesapeake are each successors in interest to an Operating Agreement dated January 1, 1957, originally executed by Union Gas Producing Company and Arkansas Louisiana Gas Company. *See* Doc. #48, Stipulation of Fact No. 4; Plaintiff Ex. 1.

There are three natural gas formations or "zones" that have been designated as Conservation Units underlying Section 18. *Id.*, Stipulation of Facts No. 5. Those formations are as follows from shallowest to deepest:

> **The Hosston (Travis Peak) Zone** in the Sligo Field, Bossier Parish, Louisiana, was defined in the Louisiana Office of Conservation Order No. 8-B, effective September 1, 1956. That order, as amended and supplemented by the 8-B Series of Orders, established rules and regulations and created drilling and production units for the exploration for and production of gas and condensate from the Hosston (Travis Peak) Zone in the Sligo Field, Bossier Parish, Louisiana. One such unit was a 640-acre unit designated as HOSS TP SUR comprised entirely of Section 18.
>
> **The Cotton Valley "D" Zone** in the Sligo Field, Bossier Parish, Louisiana, was defined in the Louisiana Office of Conservation Order No. 8-B, effective September 1, 1956. That order, as amended and supplemented by the 8-B Series of Orders, established rules and regulations and created drilling and production units for the exploration for and production of gas and condensate from the Cotton Valley "D" Zone in the Sligo Field, Bossier Parish, Louisiana. One such unit was a 640-acre unit designated as CV D SUAA comprised entirely of Section 18.
>
> **The Lower Cotton Valley Zone, Reservoir A**, in the Sligo Field, Bossier Parish, Louisiana was defined in the Louisiana Office of Conservation Order No. 8-K, effective October 16, 1990. That order, as amended and supplemented by the 8-K Series of Orders, established rules and regulations and created drilling and production units for the exploration for and production of gas and condensate from the Lower Cotton Valley Zone, Reservoir A, in the Sligo Field, Bossier Parish, Louisiana. One such unit was a 640-acre unit designated as LCV RA SUB comprised entirely of Section 18.

---

[2] Chesapeake Louisiana, L.P., owns the mineral leases in Section 18. Chesapeake Operating Inc., is a General Partner of Chesapeake Louisiana L.P., and is the party to the Operating Agreement involved in this matter. Both are owned by Chesapeake Energy Corp. The Court will refer to the companies collectively as "Chesapeake" unless clarification is necessary.

*Id.*; Plaintiff Ex. 4 and 5. The Operating Agreement covers and affects the parties' "gas and gas rights" in and to the Hosston (Travis Peak) Zone and the Cotton Valley "D" Zone. *See* Doc. #48, Stipulation of Fact No. 6; Plaintiff Ex. 1. The Operating Agreement does not cover the Lower Cotton Valley Zone, Reservoir A. *See* Doc. #48, Stipulation of Fact No. 7.

Pursuant to the Operating Agreement, the parties formed a unit for the joint operation of their mineral interests. *See* Plaintiff Ex. 1. Chesapeake is the designated "Operator" under the Agreement, and has the authority to "manage, develop, and operate said leases" subject to the contract. *Id.* EOG is designated as the "Non-Operator" under the Agreement. *Id.* The parties respective interests under the Agreement in proceeds of the sale or other disposition of unit production are as follows:

| | | |
|---|---|---|
| Chesapeake | 400 / 640 acres | 62.5% |
| EOG | 240 / 640 acres | 37.5% |

*Id.*; Doc. #48, Stipulation of Fact No. 8.

The Operating Agreement contains a provision requiring the Operator to obtain the consent of the Non-Operator prior to drilling as follows:

> No additional well shall be drilled by Operator for the Joint Account unless and until mutually agreed upon in writing by the parties hereto, and no expenditure shall be made by Operator as to any one project or item in excess of the sum of Five Thousand ($5000.00) without the written consent of the Non-Operator.....

*See* Plaintiff Ex. 1; Doc. #48, Stipulation of Fact No. 9. The Operating Agreement defines the "Joint Account" as the combined interest of the parties [to the Operating Agreement] in the Unit Area. *Id.*

3

In the past, Chesapeake proposed fourteen wells in Section 18 pursuant to the Operating Agreement, and in the case of eleven wells, operations were commenced prior to EOG's written election to participate. *See* Doc. #48, Stipulation of Fact No. 10. On February 26, 2007, Chesapeake sent three letters to EOG proposing to drill pursuant to the Operating Agreement; the Chatman 18-5 Alternate Well, the R.O. Roy 18-8 Alternate Well, and the R.O. Roy 18-9 Alternate Well, the wells that are subject to this litigation. *Id.*, Stipulation of Fact No. 22; Plaintiff Ex. 10. The following emails were exchanged between EOG's employee, Steve Himes, and Chesapeake's employee, Les Rodman:

> Email from EOG's Steve Himes to Chesapeake's Les Rodman:
>
> I'm working on my part of our internal write-up for these proposals. I've looked at the JOA [Joint Operating Agreement] dated 1/1/57 and can't find that there is a non-consent penalty contained in the agreement. Either I don't have a complete copy of the JOA or there actually is no penalty in the JOA (if that's the case – does that make the penalty effectively 100%") What do you show as the penalty? Let me know. Thanks.
>
> Chesapeake's Les Rodman's reply to EOG's Steve Himes:
>
> In the past we have always pretty much considered each as participating in the other's operations out here and have never been concerned with non-consent. Please advise if something has changed that needs to modify this practice.
>
> EOG's Steve Himes reply to Chesapeake's Les Rodman:
>
> No, nothing has changed. I was asking more for my own education than anything else. I think this is the first proposal I've seen in this section since I took over so I was trying to get up to speed with the pertinent agreements. I know we're looking hard and heavy at every dollar spent now, but as far as I know, we'll continue the same method of operation out here.

*Id.*, Stipulation of Fact No. 22; Plaintiff Ex. 4. EOG never provided written consent for the three wells requested. On May 14, 2007, Chesapeake withdrew its three previous proposals sent to EOG

4

to drill pursuant to the Operating Agreement, and re-proposed drilling the wells in accordance with provisions of Section 10, Title 30 of the Louisiana Revised Statutes of 1950, also known as Louisiana's Risk Fee Statute. *See* Plaintiff Ex. 11; Doc. #48, Stipulation of Fact No. 25. These substitute proposals were sent by Chesapeake via certified mail, return receipt requested, to Mr. Steve Himes, EOG Resources, Inc., 6101 S. Broadway, Tyler, TX 75703. *See* Doc. #50. EOG responded by letter dated June 14, 2007, through their attorney, objecting to Chesapeake's proposals. *See* Doc. #48, Stipulation of Fact No. 26; Plaintiff Ex. 12.

During 2006 and 2007, Chesapeake filed applications with the Louisiana Office of Conservation seeking the designation of three additional alternate unit wells (those subject to this litigation) in connection with the Lower Cotton Valley Zone, Reservoir A; the Cotton Valley "D" Zone, and the Hosston (Travis Peak) Zone. *See* Doc. #48, Stipulation of Fact No. 11; Def. Ex. 1 and 3. In connection with these applications, the Commissioner of Conservation for the State of Louisiana held the following public hearings on September 12, 1006: (1) Docket No. 06-1056 relative to HOSS TP SUR; (2) Docket No. 06-1062 relative to CV D SUAA; and (3) Docket No. 06-1064 relative to LCV RA SUB. *See* Doc. #48, Stipulation of Fact No. 12. The Commissioner held the following additional hearings on September 11, 2007: (1) Docket No. 07-1094 relative to HOSS TP SUR; (2) Docket No. 07-1096 relative to CV D SUAA; and (3) Docket No. 07-1097 relative to LCV RA SUB. *Id.*

The applications filed by Chesapeake in connection with the public hearings sought to designate alternate unit wells for, among other units, the HOSS TP SUR, the CV D SUAA, and the LCV RA SUB. *Id.*, Stipulation of Fact No. 13. Public notice of the scheduling of the public hearings was given to all interested owners, represented parties, and interested parties. *Id.*,

Stipulation of Fact No. 14. Notice of the hearings was given to EOG at three different addresses. *Id.* EOG had the right to oppose or object to the applications for alternate wells. *Id.*, Stipulation of Fact No. 18. EOG did not attend the public hearings, and did not oppose at the hearings the designation of the alternate unit wells for the HOSS TP SUR, the CV D SUAA, and the LCV RA SUB units. *Id.*, Stipulation of Fact No. 19.

As a consequence of the public hearings, the Louisiana Office of Conservation issued Order No. 8-B-334, effective September 12, 2006; Order No. 8-B-337, effective September 12, 2006; Order No. 8-K-132, effective September 12, 2006; Order No. 8-B-409, effective September 11, 2007; Order No. 8-B-410, effective September 11, 2007; and Order No. 8-K-175, effective September 11, 2007. *Id.*, Stipulation of Fact No. 15; Plaintiff Exs. 6, 7, and 8; Def. Exs. 5, 6, and 7. In the Orders, the Commissioner found and determined that the wells were "necessary", and that "it would be reasonable and in the interest of conservation" to designate each of the wells as alternate unit wells for the relevant units. *See* Doc. #48, Stipulation of Fact No. 16. The Commissioner further found and determined that the wells "will effectively and economically drain a portion" of the relevant units "which cannot be efficiently and economically drained by any existing well within such unit." *Id.*, Stipulation of Fact No. 17.

Chesapeake drilled and completed the Chatman 18-5 Alternate Well, the R.O. Roy 18-8 Alternate Well, and the R.O. Roy 18-9 Alternate Well. *Id.*, Stipulation of Fact No. 23. All three wells were drilled to the depth of the Lower Cotton Valley zone and completed in the shallower Cotton Hosston (Travis Peak) and Cotton Valley "D" zones. *Id.* Operations were commenced on two of the wells prior to any objection from EOG. *Id.* The R.O. Roy 18-8 Alternate Well and the R.O. Roy 18-9 Alternate Well were drilled on the R.O. Roy tract, covered by the lease owned by

EOG. *Id.*, Stipulation of Fact No. 24. The Chatman 18-5 Alternate Well was drilled on the Chatman tract, covered by a lease owned by Chesapeake. *Id.* The wells were drilled as alternate unit wells for each of the three units noted *supra*. *Id.*

Chesapeake is currently suspending EOG's share of revenues from the wells and is offsetting EOG's portion of the drilling and completion costs for each well. *Id.*, Stipulation of Fact No. 27. In addition, Chesapeake is also offsetting an additional 100% risk charge attributable to the wells and completion costs allocable to the deepest zone in each well, the Lower Cotton Valley Zone, Reservoir A. *Id.* Chesapeake contends that it may recover EOG's share of the costs out of production revenues. *Id.*, Stipulation of Fact No. 28.

## CONCLUSIONS OF LAW

EOG alleges that Chesapeake breached the terms of the Operating Agreement when it commenced and completed drilling of the R.O. Roy 18-8 Alternate Well, the R.O. Roy 18-9 Alternate Well, and the Chatman 18-5 Alternate Well without obtaining their written consent. *See* Doc. #1 at ¶14. EOG argues that Chesapeake is in breach because the wells were completed and production was obtained from the Hosston (Travis Peak) and the Cotton Valley "D" Zones, which are subject to the Operating Agreement. *Id.* Chesapeake also completed the wells and obtained production from the Lower Cotton Valley, Reservoir A, which is not covered by the Operating Agreement.

EOG filed suit asking for an accounting of its 37.5% share of all oil, gas, and condensate produced from the subject wells. *Id.* at ¶22. Further, EOG claims it is entitled to this share without any deduction for the costs incurred by Chesapeake in the drilling, completing, equipping, or operating the wells because the operations commenced without EOG's consent and in breach of the

7

Agreement. *Id.* at ¶23. EOG also requested a permanent injunction to enjoin Chesapeake from acting as Operator under the Operating Agreement and to transfer control of all Unit operations to EOG as successor Operator. *Id.* at ¶29.

After hearing EOG's case at trial and for the reasons discussed herein, this Court concludes as a matter of law that this lawsuit constitutes an impermissible collateral attack of an order of the Louisiana Commissioner of Conservation. Further, the Court concludes that Chesapeake did not breach the Operating Agreement. The wells were completed in the Hosston (Travis Peak) and the Cotton Valley "D" zones in the process of drilling to Reservoir A because the Commissioner determined the completion in those zones to be efficient.

I. <u>Collateral Attack on an Order of the Commissioner</u>

Chesapeake argues that EOG's lawsuit constitutes an improper collateral attack on orders of the Louisiana Commissioner of Conservation, even if the Court were to find that the drilling of the three unit wells constituted a breach of the Operating Agreement. *See* Doc. #31-2 at 27. EOG responds by arguing that a well permit issued by the Commissioner does not provide Chesapeake with the right to drill in violation of the Operating Agreement. *See* Doc. #40 at 5.

The Conservation Act regulates the oil and gas industry in Louisiana. *See* La. R.S. 30:1, *et seq.* The Louisiana Commissioner of Conservation is provided the jurisdiction and authority over all persons and property necessary to prevent waste and to effectively enforce the provisions of the Conservation Act and all other laws relating to the conservation of oil and gas. *See* La. R.S. 30:1A; La R.S. 30:4A; *Nunez v. Wainoco Oil & Gas Co.*, 488 So.2d 955, 961 (La. 1988). Because of the nature of hydrocarbon production, the Commissioner is also granted the specific power to establish a drilling unit or units for each pool. *See* La. R.S. 30:9B. The Commissioner may require or force

8

"unwilling landowners to pool their interests if he finds that it is necessary to prevent waste or avoid drilling unnecessary wells." *See Nunez*, 488 So.2d at 961, citing La. R.S. 30:10(A)1.

The Louisiana Supreme Court examined the relationship between a landowner's rights in minerals found under their land and the authority of the Commissioner to affect those rights in the benchmark case of *Nunez v. Wainoco Oil & Gas*. An individual's ownership of land does not include the ownership of oil, gas, and other minerals, but does provide the exclusive right of a landowner to develop his property for the production of minerals and to reduce them to possession and ownership. *See* Louisiana Mineral Code (Title 31), section 6. This "exclusive right" is subject to the State's reasonable exercise of police power. *See Nunez*, 488 So.2d at 962-963; La. Const. art. I section 4. This police power includes the power to establish drilling units and to designate a drilling site at the optimum position for the most efficient and economic drainage of the unit. *Nunez*, 488 So.2d at 963 (internal citations omitted).

"The Commissioner must also issue a permit before the well can be drilled, and the issuance of the permit is sufficient authorization to the holder [] to enter upon the property covered by the permit and to drill in search of minerals thereon." *Id.* (internal citations omitted). The Louisiana Supreme Court noted in *Nunez* that La. R.S. 30:204 does not specifically require the permit holder to obtain the consent of the landowner prior to entering the land to drill. *Id.* The Court in *Nunez* also examined a decision from the Oklahoma Supreme Court which held that "the operator of a pooled unit has the right to drill on a tract without the consent of the owner of the land on which the well was to be located," less the intent of the Act [regarding pooling] be frustrated. *Id.* The Louisiana Supreme Court concluded in *Nunez* that established principles of private ownership, such as trespass, need not be applied within a drilling unit. *Id.* When the Commissioner has determined that

landowners share a common interest, such as a drilling unit, one participant cannot "rely on a concept of individual ownership to thwart the common right to the resource as well as the important state interest in developing its resources fully and efficiently." *Id.* at 964.[3]

The Conservation Act specifically provides the Commissioner with the following powers relevant to this matter:

(1) to make such inquiries as he thinks proper to determine whether or not waste, over which he has jurisdiction, exists or is imminent;

(2) to make, after notice and hearings as provided in this Chapter, any reasonable rules, regulations, and orders that are necessary from time to time for proper administration and enforcement, including rules, regulations, or orders for the following purposes:

    (a) to prevent wells from being drilled, operated, and produced in a manner to cause injury to neighboring leases or property,

    (b) to identify the ownership of all oil or gas wells, producing leases, refineries, tanks, plants, structures, and all storage and transportation equipment and facilities,

    (c) to limit and prorate the production of oil or gas or both from any pool or field for the prevention of waste,

    (d) to regulate the spacing of wells and to establish drilling units, including temporary or tentative spacing rules and drilling units in new fields.

*See* La. R.S. 30:4C; *Hunt Oil Co. v. Batchelor*, 644 So.2d 191 (La. 1994).

A party may challenge a rule, regulation, or order by first exhausting their administrative remedies. *See* La. R.S. 30:12A. Thereafter, a party may obtain court review by filing suit against the Commissioner in the parish where the Commissioner's principal office is located, the 19th Judicial District Court for East Baton Rouge Parish, Louisiana. *Id.* This procedure is the exclusive

---

[3] EOG argued at trial that Chesapeake trespassed by drilling through two leases owned wholly by EOG. Because the leases involve reservoirs incorporated in a drilling unit established by the Commissioner, this argument is without merit.

10

manner in which an order of the Commissioner may be reviewed in a judicial proceeding. *Trahan v. Superior Oil Co.*, 700 F.2d 1004, 1015 (5th Cir. 1983).

Any challenge outside this procedure constitutes a "collateral attack" and is prohibited. *See Id.* The rule prohibiting the collateral attack of an order is not limited to matters where the judgment will directly affect the actual enforcement or compliance with the order. *Id.* (internal quotations omitted). "Rather, the rule also extends to suits between private parties in which a particular order of the Commissioner is an operative fact upon which the determination of the parties' respective rights directly depends, even though all relief sought can be given, such as by money damages or lease cancellation, without thereby causing any actual violation of the Commissioner's order." *Id.* at 1015-1016.

EOG argued at trial that the collateral attack doctrine is not implicated in this matter because it is only seeking to enforce an obligation, not challenge the order of the Commissioner. As support, EOG cited *United Gas Pipe Line Co. v. Watson Oil Corp*, 306 So.2d 731 (La. 1975). In that case, United sought and obtained from the Commissioner an order requiring a specific casing program when drilling through a certain reservoir in order to protect against the escape of natural gas. *Id.* 732-733. In addition, United entered into agreements with International Paper and Long Bell Petroleum to store natural gas in a portion of the reservoir located beneath their land. *Id.* at 733. The contract included an agreement to use all reasonable efforts to protect the gas stored in the reservoir. *Id.*

Some years later, Watson Oil, who had acquired an interest to explore beneath the land, was preparing to drill through the reservoir. *Id.* United filed suit seeking a temporary restraining order and a temporary and permanent injunction to prevent this exploration because Watson planned to

11

drill through the reservoir without implementing the stricter requirements contained in the contract. *Id.* Watson argued that United's effort to require specific casing was a collateral attack on the order of the Commissioner, and should have been filed in East Baton Rouge parish as provided in the statute. *Id.* at 734. United responded by arguing that the venue chosen was proper because they were merely seeking to enforce the storage agreements, and were not directly or collaterally attacking the Commissioner's order. *Id.* at 734-735. The lower courts agreed with Watson's argument. *Id.* The Louisiana Supreme Court reversed, holding that the lawsuit did not conflict with the Commissioner's order, and therefore was properly filed in the venue where the property was located. Specifically, the Court limited the exclusive venue imposed by La. R.S. 30:12 to those cases where the substance of the Commissioner's order is under attack. *Id.* at 735. In a case involving a contractual dispute, the contract requirement must be offensive to the order, considering the order's intended purpose; mere supplemental requirements may be provided by contract. *Id.* (internal citations omitted).

The facts in this matter support a finding that this lawsuit amounts to a collateral attack on an order of the Commissioner. There is no dispute that the Commissioner of Conservation issued orders allowing Chesapeake to drill the wells in question. Further, the Commissioner found that the wells and their proposed spacing were necessary and in the interest of conservation. *See* Plaintiff Exs. 6, 7, and 8; Def. Exs. 5, 6, and 7. The issuance and content of these orders constitute an operative fact of this litigation. Chesapeake proposed the drilling of the three wells to EOG under both the Operating Agreement, which was later withdrawn, and pursuant to La. R.S. 30:10. EOG did not respond to Chesapeake's first proposal and objected to the second proposal of drilling the wells pursuant to the statute. *See* Doc. #48, Stipulation of Fact No. 26; Plaintiff Ex. 12. EOG maintains that it did not consent to the drilling of the wells under the Operating Agreement because

the wells were unnecessary and would be drilled too close to already existing wells. *See* Doc. #27 at 4; Deposition of Richard Rhodes at 16-18. Such a contention is in direct conflict with the orders of the Commissioner, and constitutes an impermissible collateral attack. Therefore, lack of consent based on EOG's opinion that the wells were unnecessary and too close to other existing wells cannot serve as the basis for EOG's claim for damages based on Chesapeake's alleged breach of the Operating Agreement when Chesapeake drilled in accordance with the Commissioner's orders.

II. <u>Alleged Breach of Contract</u>

EOG argues that Chesapeake breached the Operating Agreement by drilling wells without obtaining their express consent. *See* Doc. #27, at 5-6. EOG cites Article VII of the Operating Agreement which states:

> No additional well shall be drilled by Operator for the Joint Account unless and until mutually agreed upon in writing by the parties hereto, and no expenditure shall be made by Operator as to any one project or item in excess of the sum of Five Thousand ($5,000.00) without the written consent of Non-Operator ... .

*See Id.*; Plaintiff Ex. 1. The wells in question were drilled to gain access to the Lower Cotton Valley Zone, Reservoir A, which is not covered by the operating agreement. *See* Doc. #48, Stipulation of Fact No. 23. However, the wells were also completed in the shallower Cotton Hosston (Travis Peak) and Cotton Valley "D" Zones, which are covered by the agreement. *See Id.* The Operating Agreement has not been amended since its formation in 1957. It does not contain a "subsequent operations" clause, a Pugh clause, or any reference to drilling into formations below those specifically referenced in the Operating Agreement.

It is this Court's finding that Chesapeake did not breach the Operating Agreement because the wells were drilled for the purpose of reaching the Lower Cotton Valley Zone, Reservoir A. The

13

Operating Agreement is limited to those formations described in the contract. *See* Plaintiff Ex. 1. The Lower Cotton Valley Zone, Reservoir A is not mentioned in the Operating Agreement, and the contract has not been amended to reflect its inclusion. There is no contractual agreement between the parties with respect to this formation. Without a contractual agreement, there can be no breach thereof.

Although the wells were completed in the two zones subject to the Operating Agreement, such completion was found to be necessary and in the interest of conservation by the Commissioner of Conservation. The Louisiana Commissioner of Conservation is vested with considerable authority over persons and property to prevent waste and protect the state's oil and gas reserves. *See supra.* The three wells in question were completed in the shallower Cotton Hosston (Travis Peak) and Cotton Valley "D" Zones because the Commissioner determined it was necessary and in the interest of conservation to effectively and economically drain portions of those zones in connection with the drilling to Reservoir A. *See* Plaintiff Exs. 6, 7, and 8; Def. Exs. 5, 6, and 7. As discussed *supra*, a breach of contract claim based on the completion of the wells in these zones constitutes an impermissible collateral attack on an order of the Commissioner of Conservation.

## CONCLUSION

Based on the foregoing, judgment is hereby rendered in favor of Chesapeake Energy Corp., Chesapeake Operating Inc., and Chesapeake Louisiana L.P., and all of EOG's claims against these Defendants are **DISMISSED WITH PREJUDICE**. A judgment consistent with this Memorandum Ruling will issue herewith.

DONALD E. WALTER
UNITED STATES DISTRICT JUDGE

14