U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - SHREVEPORT

MAR 28 2013

TONY R. MOORE, CLERK
BY_____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| EOG RESOURCES, INC. | CIVIL ACTION NO: 07-1246 |
| VERSUS | JUDGE DONALD E. WALTER |
| CHESAPEAKE ENERGY CORPORATION, ET AL | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

The above captioned matter came before the Court on remand from the United States Fifth Circuit Court of Appeals [Doc. #66], which reversed this Court's prior Memorandum Ruling [Doc. #56] and Judgment [Doc. #57]. This Court previously held that the breach of contract claims brought by EOG Resources Inc. ("EOG") were barred as an impermissible collateral attack upon the orders of the Louisiana Commissioner of Conservation. [Doc. #56 and #57]. The ruling was made at the conclusion of EOG's case in chief pursuant to Federal Rule of Civil Procedure 52(c). The Fifth Circuit reversed, remanding this matter for the Court to determine EOG's breach of contract claims. On remand this Court resumed the partially completed bench trial, allowing the Defendant, Chesapeake Energy Corp. et al ("Chesapeake"), to present its case in chief and EOG to present rebuttal if necessary.[1]

Having heard the evidence presented at trial and having read the briefs submitted by the parties, the court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52. To the extent that any finding of fact constitutes a conclusion of law the court hereby adopts it as such, and to the extent that any conclusion of law constitutes a

---

[1] EOG names as defendants Chesapeake Energy Corp., Chesapeake Operating, Inc., and Chesapeake Louisiana L.P. The court refer to the Defendants in the singular as "Chesapeake".

finding of fact the court hereby adopts it as such.

## FINDINGS OF FACT [2]

EOG and Chesapeake are each owners of mineral leases of a certain township in south Bossier Parish, Louisiana, Section 18. EOG owns the 240 acre R.O. Roy mineral lease in Section 18. [Stipulation of Fact No. 1; Plaintiff's Ex. 2]. Chesapeake owns the mineral leases covering the remaining 400 acres of Section 18. [Stipulation of Fact No. 2; Plaintiff's Ex. 2]. EOG and Chesapeake are each successors in interest to an Operating Agreement dated January 1, 1957, originally executed by Union Gas Producing Company and Arkansas Louisiana Gas Company. [Stipulation of Fact No. 4; Plaintiff's Ex. 1].

There are three natural gas formations or "zones" designated as Conservation Units underlying Section 18. [Stipulation of Fact No. 5]. The formations are as follows from shallowest to deepest:

> **The Hosston (Travis Peak) Zone** in the Sligo Field, Bossier Parish, Louisiana, was defined in the Louisiana Office of Conservation Order No. 8-B, effective September 1, 1956. That order, as amended and supplemented by the 8-B Series of Orders, established rules and regulations and created drilling and production units for the exploration for and production of gas and condensate from the Hosston (Travis Peak) Zone in the Sligo Field, Bossier Parish, Louisiana. One such unit was a 640-acre unit designated as HOSS TP SUR comprised entirely of Section 18.
>
> **The Cotton Valley "D" Zone** in the Sligo Field, Bossier Parish, Louisiana, was defined in the Louisiana Office of Conservation Order No. 8-B, effective September 1, 1956. That order, as amended and supplemented by the 8-B Series of Orders, established rules and regulations and created drilling and production units for the exploration for and production of gas and condensate from the Cotton Valley "D" Zone in the Sligo Field, Bossier Parish, Louisiana. One such unit was a 640-acre unit designated as CV D SUAA comprised entirely of Section 18.

---

[2] The court supplements the stipulated facts with documentary evidence presented during bench trial of the instant matter. All stipulated facts are found in the Pretrial Order. [Doc. #48].

2

> **The Lower Cotton Valley Zone, Reservoir A** in the Sligo Field, Bossier Parish, Louisiana was defined in the Louisiana Office of Conservation Order No. 8-K, effective October 16, 1990. That order, as amended and supplemented by the 8-K Series of Orders, established rules and regulations and created drilling and production units for the exploration for and production of gas and condensate from the Lower Cotton Valley Zone, Reservoir A, in the Sligo Field, Bossier Parish, Louisiana. One such unit was a 640-acre unit designated as LCV RA SUB comprised entirely of Section 18.

[Plaintiff's Exs. 4 and 5]. The Operating Agreement covers and affects the parties' "gas and gas rights" in and to the Hosston (Travis Peak) Zone and the Cotton Valley "D" Zone. [Stipulation of Fact No. 6; Plaintiff's Ex. 1]. The Operating Agreement does not cover the Lower Cotton Valley Zone, Reservoir A. [Stipulation of Fact No. 7].

Pursuant to the Operating Agreement, the parties formed a unit for the joint operation of their mineral interests. [Plaintiff's Ex. 1]. Chesapeake is the designated "Operator" under the Agreement, and has the authority to "manage, develop, and operate said leases" subject to the contract. *Id.* EOG is designated as the "Non-Operator" under the Operating Agreement. *Id.* The parties respective interests under the Operating Agreement in proceeds of the sale or other disposition of unit production are as follows:

| | | |
|---|---|---|
| Chesapeake | 400 / 640 acres | 62.5% |
| EOG | 240 / 640 acres | 37.5% |

[Stipulation of Fact No. 8].

The Operating Agreement contains a provision requiring the Operator to obtain the consent of the Non-Operator prior to drilling as follows:

> No additional well shall be drilled by Operator for the Joint Account unless and until mutually agreed upon in writing by the parties hereto, and no expenditure shall be made by Operator as to any one project or item in excess of the sum of Five Thousand ($5000.00) without the written consent of the Non-Operator.

3

[Plaintiff's Ex. 1; Stipulation of Fact No. 9]. The Operating Agreement defines the "Joint Account" as the combined interest of the parties in the Unit Area. *Id.*

During 2006 and 2007, Chesapeake filed applications with the Louisiana Office of Conservation seeking the designation of three additional alternate unit wells (the wells subject to this litigation) in connection with the Lower Cotton Valley Zone, Reservoir A; the Cotton Valley "D" Zone, and the Hosston (Travis Peak) Zone. [Stipulation of Fact No. 11; Defendants' Exs. 1 and 3]. In connection with these applications, the Commissioner of Conservation for the State of Louisiana held the following public hearings on September 12, 2006: (1) Docket No. 06-1056 relative to ROSS TP SUR; (2) Docket No. 06-1062 relative to CV D SUAA; and (3) Docket No. 06-1064 relative to LCV RA SUB. [Stipulation of Fact No. 12]. The Commissioner held the following additional hearings on September 11, 2007: (1) Docket No. 07-1094 relative to HOSS TP SUR; (2) Docket No. 07-1096 relative to CV D SUAA; and (3) Docket No. 07-1097 relative to LCV RA SUB. *Id.*

The applications filed by Chesapeake in connection with the public hearings sought to designate alternate unit wells for, among other units, the HOSS TP SUR, the CV D SUAA, and the LCV RA SUB. [Stipulation of Fact No. 13]. Public notice of the scheduling of the public hearings was given to all interested owners, represented parties, and interested parties. [Stipulation of Fact No. 14]. Notice of the hearings was given to EOG at three different addresses. *Id.* EOG had the right to oppose or object to the applications for alternate wells. [Stipulation of Fact No. 18]. EOG did not attend the public hearings, and did not oppose at the hearings the designation of the alternate unit wells for the HOSS TP SUR, the CV D SUAA, and the LCV RA SUB units. [Stipulation of Fact No. 19].

As a consequence of the public hearings, the Louisiana Office of Conservation issued Order

4

No. 8-B-334, effective September 12, 2006; Order No. 8-13-337, effective September 12, 2006; Order No. 8-K-132, effective September 12, 2006; Order No. 8-13-409, effective September 11, 2007; Order No. 8-13-410, effective September 11, 2007; and Order No. 8-K-175, effective September 11, 2007. [Stipulation of Fact No. 15; Plaintiff's Exs. 6, 7, and 8; Defendants' Exs. 5, 6, and 7]. In the Orders, the Commissioner found and determined that the wells were "necessary", and that "it would be reasonable and in the interest of conservation" to designate each of the wells as alternate unit wells for the relevant units. [Stipulation of Fact No. 16]. The Commissioner further found and determined that the wells "will efficiently and economically drain a portion" of the relevant units "which cannot be efficiently and economically drained by any existing well within such unit." [Stipulation of Fact No. 17]. Neither EOG nor any other person sought a judicial review of the Orders under La. R.S. 30:12. [Stipulation of Fact No. 20].

Prior to proposing the wells at issue in this litigation, Chesapeake proposed fourteen wells in Section 18 pursuant to the Operating Agreement, and in the case of eleven wells, operations were commenced prior to EOG's written election to participate. [Stipulation of Fact No. 10]. On February 26, 2007, Chesapeake sent three letters to EOG proposing to drill the three wells involved in this litigation pursuant to the Operating Agreement; the Chatman 18-5 Alternate Well, the R.O. Roy 18-8 Alternate Well, and the R.O. Roy 18-9 Alternate Well. [Stipulation of Fact No. 22; Plaintiff's Ex. 10]. Thereafter, the following emails were exchanged between EOG's employee, Steve Himes, and Chesapeake's employee, Les Rodman:

> Email from EOG's Steve Himes to Chesapeake's Les Rodman:
>
> I'm working on my part of our internal write-up for these proposals. I've looked at the JOA [Joint Operating Agreement] dated 1/1/57 and can't find that there is a non-consent penalty contained in the agreement. Either I don't have a complete copy of the JOA or there actually is no penalty in the JOA (if that's the case – does that

5

make the penalty effectively 100%?) What do you show as the penalty? Let me know. Thanks.

<u>Chesapeake's Les Rodman's reply to EOG's Steve Himes</u>:

In the past we have always pretty much considered each as participating in the other's operations out here and have never been concerned with non-consent. Please advise if something has changed that needs to modify this practice.

<u>EOG's Steve Himes reply to Chesapeake's Les Rodman</u>:

No, nothing has changed. I was asking more for my own education than anything else. I think this is the first proposal I've seen in this section since I took over so I was trying to get up to speed with the pertinent agreements. I know we're looking hard and heavy at every dollar spent now, but as far as I know, we'll continue the same method of operation out here.

[Stipulation of Fact No. 22; Plaintiff's Ex. 4].

EOG never provided written letters of consent for the three wells requested. Despite the email exchange above, Steve Himes, for EOG, testified that it did not give consent to the three well proposals. [Doc. # 62, Transcript p. 31; Plaintiff Ex. 20]. As to one of the wells, Chesapeake started drilling before it gave notice to EOG. [Doc. #62, Transcript at p. 60]. The Court notes that a history existed between the two parties indicating that on numerous occasions Chesapeake failed to give proper notice, without objection from EOG.

On May 14, 2007, Chesapeake withdrew its three previous proposals sent to EOG to drill pursuant to the Operating Agreement, and re-proposed drilling the wells in accordance with the provisions of Section 10, Title 30 of the Louisiana Revised Statutes of 1950, also known as Louisiana's Risk Fee Statute. [Plaintiff's Ex. 11; Stipulation of Fact No. 25]. The total estimated cost of drilling, testing, completing and equipping the three wells in the Lower Cotton Valley, Reservoir A zone were included as required under La. R.S. 30:10. [Plaintiff Ex. 11]. These substitute proposals were sent by Chesapeake via certified mail, return receipt requested, to Mr. Steve Himes,

EOG Resources, Inc., 6101 S. Broadway, Tyler, TX, 75703. [Doc. #50]. EOG responded by letter dated June 14, 2007, through their attorney, objecting to Chesapeake's proposals. [Stipulation of Fact No. 26; Plaintiff's Ex. 12].

Chesapeake drilled and completed the Chatman 18-5 Alternate Well, the R.O. Roy 18-8 Alternate Well, and the R.O. Roy 18-9 Alternate Well. [Stipulation of Fact No. 23]. All three wells were drilled and completed to the depth of the Lower Cotton Valley, Reservoir A zone, but <u>were also completed in the shallower Hosston (Travis Peak) and Cotton Valley "D" zones</u>. *Id.* (emphasis added). Operations were commenced on two of the wells prior to any objection from EOG. *Id.* The R.O. Roy 18-8 Alternate Well and the R.O. Roy 18-9 Alternate Well were drilled on the R.O. Roy tract, covered by the lease owned by EOG. [Stipulation of Fact No. 24]. The Chatman 18-5 Alternate Well was drilled on the Chatman tract, covered by a lease owned by Chesapeake. *Id.* The wells were drilled as alternate unit wells for each of the three units as noted *supra*. *Id.*

Because EOG elected not to participate in the cost, risk and expense of drilling the three wells, Chesapeake maintains that the wells were drilled independent of the Operating Agreement. Further, Chesapeake maintains that it drilled the three wells in good faith as Operator and in performance of the Operating Agreement, and cannot be held liable by EOG as Non-Operator for its actions. [Plaintiff's Ex. 1 at p. 3]. Chesapeake is currently suspending EOG's share of revenues from the wells and is offsetting EOG's portion of the drilling and completion costs for each well. [Stipulation of Fact No. 27]. In addition, Chesapeake is also offsetting an additional 100% risk charge attributable to the wells and completion costs allocable to the deepest zone in each well, the Lower Cotton Valley Zone, Reservoir A. *Id.* Chesapeake does not contend that EOG has any personal "out of pocket" financial responsibility for the wells, although it does contend that it may

recover EOG's share of the costs out of production revenues. [Stipulation of Fact No. 28].

The three wells produce from all three zones (the Lower Cotton Valley, Reservoir A, Cotton Valley "D", and the Hosston (Travis Peak)) through a single borehole. Production from each well is combined and is not separately gauged by zone. Chesapeake incurred drilling costs in all three zones to reach the Lower Cotton Valley, Reservoir A zone. Chesapeake also incurred completion and equipping costs and operating costs in all three zones.

Chesapeake's senior supervisor in operations accounting, Ms. Carole Tear, testified as to the proper means of accounting and allocating revenue and costs between the various zones of the wells, and the application of the risk charge to the different types of costs. [Doc. #72, Transcript at p.4]. She testified as to the industry standards for accounting in the petroleum industry under "COPAS" (Council of Petroleum Accountant Societies) and was tendered to the Court, without objection, as an expert in this field. [*Id.* at pp. 6 and 8].

She testified that each zone of each well should be accounted for separately and that the drilling, completion, and operating costs incurred by Chesapeake can be separated and allocated to each of the three zones completed in each well under COPAS guidelines. [*Id.* at p.40-41].

She testified that, because each well is producing from three zones, that there are certain rules to allocate revenue attributable to each zone; in this case, 50% to the lower zone (Lower Cotton Valley, Reservoir A) and 50% of the revenue to the upper two zones (Hosston and Cotton Valley "D"). [Doc. #72, Transcript at p. 41-42].

She testified that, if the Court were to order Chesapeake to account to EOG for its share of revenue from the production from the upper two zones (Hosston and Cotton Valley "D" zones) without any offset for drilling, completion or operation costs, Chesapeake could render such an

8

accounting under the COPAS rules and standards.

Ms. Tear testified that, under COPAS industry guidelines EOG's interest in each well should be accounted for separately, on a well-by-well basis; i.e., if one of the three wells at issue "pays out", then EOG should be paid on that well, even though the other wells have not yet paid out. [*Id.* at p. 40]. However, she also testified that state law would supersede COPAS guidelines if there is a conflict. [*Id.* at 37].

## CONCLUSIONS OF LAW[3]

EOG alleges that Chesapeake breached the terms of the Operating Agreement when it commenced and completed the drilling of the R.O. Roy 18-8 Alternate Well, the R.O. Roy 18-9 Alternate Well, and the Chatman 18-5 Alternate Well without obtaining their written consent. [Doc. #1 at ¶ 14]. EOG argues that Chesapeake is in breach because the wells were completed and production was obtained from the Hosston (Travis Peak) and the Cotton Valley "D" Zones, which are subject to the Operating Agreement. *Id.* Chesapeake also completed the wells and obtained production from the Lower Cotton Valley, Reservoir A, which is not covered by the Operating Agreement. EOG filed suit asking for an accounting of its 37.5% share of all oil, gas, and condensate produced from the subject wells. [*Id.* at ¶22]. Further, EOG claims it is entitled to this share without any deduction for the costs incurred by Chesapeake in the drilling, completing, equipping, or operating the wells because the operations commenced without EOG's consent and in breach of the Agreement. [*Id.* at ¶23]. EOG had previously prayed for a permanent injunction to enjoin Chesapeake as Operator and to transfer Unit operations to EOG as successor Operator. [*Id.*

---

[3] Chesapeake's Motion for Leave to File a Proposed Form of Judgment [Doc. #78] is GRANTED.

at ¶29]. However, EOG has advised the Court that it no longer seeks this relief. Thus, EOG now seeks only the remedy of an accounting.

Each of the three wells, the Chatman 18-5 Alternate Well, the R.O. Roy 18-8 Alternate Well, and the R.O. Roy 18-9 Alternate well were drilled within the geographic area subject to the Operating Agreement. To the extent the wells are completed in and producing from the upper two zones (the Hosston (Travis Peak) and the Lower Cotton Valley "D"), they constitute wells drilled into the combined interest of the parties under the Operating Agreement. Accordingly, the parties' rights and obligations with respect to the costs and revenue from production attributable to the two upper zones in each of the three wells is governed by the Operating Agreement. La. Civ. Code art. 1983 (the parties' contract establishes the law between them). Chesapeake's failure to obtain EOG's written consent to drill wells into the upper two zones constitutes a breach of the Operating Agreement, Article VII. *See Lancaster v. Petroleum Corp. of Delaware*, 491 So.2d 768, 777 (La. App. 3d Cir. June 25, 1986) (an operator who proceeds with operations in violation of a consent requirement in the operating agreement commits a breach of the agreement).

The Operating Agreement provides that EOG is to be allocated 37.5% of all production from wells subject to the Operating Agreement. Accordingly, Chesapeake must account to EOG for its 37.5% share of the production attributable to the upper two zones (Hosston and Cotton Valley "D") from each of the wells. Chesapeake's expert accountant testified that under the COPAS rules 50% of the total well production is allocable to the upper two zones. Thus EOG is entitled to an accounting for its 37.5% share of the 50% of each well's production under the Operating Agreement.

In accounting to EOG for the revenue attributable to the upper two zones of each of the three wells, Chesapeake is entitled to withhold only EOG's share of costs attributable to the drilling of

those upper two zones (Hosston and Cotton Valley "D"). Chesapeake is not entitled to costs attributable to completion, equipping or operation in those zones.

Accordingly, Chesapeake is obligated to account to EOG for its 37.5% share of revenue from the 50% of total well production, past and future, that is attributable to the upper two (Hosston and Cotton Valley "D") zones, for each of the Chatman 18-5 Alternate Well, the R.O. Roy 18-8 Alternate Well, and the R.O. Roy 18-9 Alternate Well, without withholding or deducting completion, equipping, or operating allocable to the upper two zones in each well under COPAS accounting guidelines.

To the extent the three wells were drilled into, completed in, and produced from the Lower Cotton Valley, Reservoir A zone, such portion of each well was below the lowest depth covered by the Operating Agreement. The Lower Cotton Valley, Reservoir A zone is not mentioned in the Operating Agreement, and the contract has not been amended to reflect its inclusion. There is no contractual agreement between the parties with respect to this formation. Accordingly, Chesapeake did not breach the Operating Agreement by drilling, completing, and producing from the Lower Cotton Valley, reservoir A zone.

Because the Operating Agreement is not applicable to the portion of the three wells drilled into the Lower Cotton Valley, Reservoir A zone, the parties' rights and obligations are governed by the Conservation statute, La. R.S. 30:10 *et. seq.* Under the Unit Orders for this zone, the production was allocated between the parties on the same basis as the upper two zones: 37.5% to EOG, 62.5% to Chesapeake.

In accounting to EOG for its share of revenue from the Lower Cotton Valley, Reservoir A zone, Chesapeake is statutorily authorized to recover, out of those revenues, EOG's percentage share

11

of the costs of drilling, testing, completing, equipping, and operating allocable to that zone. La. R.S. 30:10(A)(2)(b). Additionally, because Chesapeake gave the required statutory notice to EOG, Chesapeake is entitled to recover an additional "risk charge" equal to 100% of the costs of drilling and completing into that zone. La. R.S. 30:10(A)(2)(b)(i).[4]

Accordingly, Chesapeake is obligated to account to EOG for its 37.5% share of revenue from the 50% of total well production, past and future, that is attributable to the Lower Cotton Valley, Reservoir A zone, for each of the Chatman 18-5 Alternate Well, the R.O. Roy 18-8 Alternate Well, and the R.O. Roy 18-9 Alternate Well. However, as to each well, Chesapeake may withhold EOG's share of revenue attributable to the Lower Cotton Valley, Reservoir A zone in that well sufficient to recover EOG's 37.5% share of the drilling, testing, completion, equipping, and operating costs as well as an additional risk charge equal to 100% of EOG's share of drilling, testing and completion costs, pursuant to COPAS accounting guidelines.

Under Louisiana law, the failure of an operator to properly account to another interest owner in a well permits the remedy of an accounting. *Lamson Petroleum Corp. v. Hallwood Petroleum, Inc.*, 890 So.2d 684, 686 (La. App. 3rd Cir. Dec. 8, 2004) (affirming trial court's order to render an accounting for unpaid well revenues within 60 days of judgment). The accounting should provide for all revenue owed EOG, deducting only the costs permitted by the Court in this ruling, and should include interest at the legal rate on any net revenue owed to EOG from the time it was originally due until the rendering of the accounting to EOG.

Louisiana law allows Chesapeake to setoff any amount it might owe to EOG against the

---

[4] Under La. Acts 2008, No. 115, §1, La. R.S. 30:10 was amended and the "risk charge" was raised to 200%. Since the wells were drilled and notice was given in 2007, prior to the effective date of the change, the 100% risk charge in effect at the time is applicable.

amount EOG owes Chesapeake. *See* La. Civ. Code art. 1893. However, even if Chesapeake were not entitled to setoff under the law this Court would order judicial compensation to require setoff because Chesapeake and EOG are mutually indebted to each other. *Buck's Run Enterprises, Inc. v. Mapp Construction, Inc.*, 808 So. 2d 428, 432 (La. App. 1st Cir. Feb. 16, 2001).

Accordingly, this Court shall render judgment in favor of EOG Resources Inc., in part, and in favor of Chesapeake, in part. Chesapeake Louisiana, L.P., (as owner of the jointly operated leases) and Chesapeake Operating Inc. (as Operator under the Operating Agreement) shall be ordered, jointly and severally, to render an accounting to EOG Resources Inc. within sixty (60) days of the judgment, accounting to EOG as follows:

(a) Separately, as to each the Chatman 18-5 Alternate Well, the R.O. Roy 18-8 Alternate Well, and the R.O. Roy 18-9 Alternate Well:

(i) Chesapeake shall account for EOG's 37.5% of the 50% of the well revenue attributable to the Hosston and Cotton Valley "D" zones without deduction of completion, equipping, or operating costs allocable to those zones under COPAS guidelines, plus legal interest on that revenue accrued from the time received by Chesapeake until paid to EOG;

(ii) Chesapeake shall account for EOG's 37.5% of the 50% of the well revenue attributable to the Lower Cotton Valley, Reservoir A zone, but Chesapeake shall be entitled to withhold and recover 100% of EOG's 37.5% share of the drilling, testing, completing, equipping, and operating costs allocable to those zones under COPAS guidelines, plus an additional risk charge of 100% of EOG's 37.5% share of the drilling and completion costs allocable to those zones.

(b) Furthermore, Chesapeake has a right to setoff any amount it might owe EOG for its proportionate share of production from the Hosston and Cotton Valley "D" zones against the amount that EOG owes Chesapeake for the expenses and the risk fee charge associated with the Lower Cotton Valley, Reservoir A zone.

(c) Thereafter, Chesapeake shall render a monthly accounting to EOG on each well, in conformity with this ruling, no later than sixty (60) days after the end of each production month until the wells permanently cease production.

**THUS DONE AND SIGNED**, this 28th day of March 2013.

_____
DONALD E. WALTER
UNITED STATES DISTRICT JUDGE